IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


v.                                                    CASE NO. 92-CR-35 (DNH)


ROBERT LAWRENCE,

                        Defendant.
_____


# MEMORANDUM OF LAW IN SUPPORT OF
# ROBERT LAWRENCE'S RESENTENCING



DATED:        December 19, 2013

                                    Lisa A. Peebles
                                    Federal Public Defender
                                    Bar Roll No. 507041
                                    Clinton Exchange, 3rd Floor
                                    4 Clinton Street
                                    Syracuse, New York   13202
                                    (315) 701-0080

## PRELIMINARY STATEMENT

For the last twenty-two years, Robert Lawrence ("Robert" or " Mr. Lawrence") has been imprisoned for a crime committed when he was sixteen years old.  As matters currently stand, he must spend the rest of his life in prison.  This is because at the time of his original federal sentencing, the District Court was statutorily required to impose a sentence of life without parole.  The Supreme Court has since found that the mandatory imposition of a life sentence without the possibility of parole, without consideration of any mitigating evidence, violates a juvenile offender's constitutional protection against cruel and unusual punishment.  Accordingly, this Court has ordered a resentencing hearing at which Mr. Lawrence is no longer subject to a mandatory life term of imprisonment.  In light of Mr. Lawrence's background, the circumstances surrounding the underlying offense, and his substantial post-offense rehabilitation and maturation, defense counsel respectfully requests this Court to impose a sentence that ensures he will be given an opportunity to seek state parole after serving a total term of 30 years' imprisonment.  Achieving that result in this case requires the imposition of a combined federal term of 6 years' imprisonment to run concurrent, on the date of sentencing, to the 30-year to life term of imprisonment Mr. Lawrence is currently serving in state prison for the same underlying conduct.  More specifically, defense counsel requests this Court to impose a one-year sentence on Counts 1, 6, and 7 to run concurrent to each other, but consecutive to a five-year sentence on Count 8, for a total federal sentence of 6 years' imprisonment.  Furthermore, defense counsel requests that this Court designate the state facility as the place for Mr. Lawrence, who is in primary state custody, to serve the federal sentence, which will ensure that the federal sentence runs concurrent to the state sentence of 30 years to life Mr. Lawrence is currently serving. To

ensure the sincerity of Mr. Lawrence's commitment to post-conviction rehabilitation, this Court may also impose a term of federal supervised release.

## PROCEDURAL AND FACTUAL BACKGROUND

The offenses resulting in Robert Lawrence's imprisonment stem from his involvement in a drug conspiracy and the tragic death of Syracuse Police Officer Wallie Howard.  As summarized in the Presentence Report ("PSR"), Jaime Davidson and others had established an illicit drug operation in the Syracuse, New York area during the late 1980s and early 1990s. PSR ¶ 6.  Davidson eventually recruited Mr. Lawrence to come from Brooklyn, New York to participate in the operation in 1989.  *Id.* at ¶ 27.  Robert Lawrence was then 15 years old.  *Id.* During October 1990, Davidson devised a scheme to sell cocaine to Luther Gregory and Wallie Howard, who, unknown to all co-defendants, was working in an undercover capacity with Central New York Drug Enforcement Task Force ("CNYDETF"), but to rob them of the purchase money.  *Id.* at ¶ 18.  As reported in the PSR, Davidson devised this scheme to retaliate against Gregory, who Davidson believed had previously stolen from him.  *Id.* at ¶ 18.  To this end, Davidson instructed Mr. Lawrence and a co-defendant, Gary Anthony Stewart, to rob Wallie Howard of the purchase money after subduing Gregory in a nearby apartment.  *Id.*  In carrying out these orders on October 30, 1999, Mr. Lawrence and Stewart approached a vehicle located in the parking lot of a supermarket in which Wallie Howard was waiting in a passenger seat.  *Id.* at ¶ 20.  Stewart entered through the drivers side door, sat in the drivers seat, brandished a firearm, and demanded the purchase money from Wallie Howard, who responded by firing three shots at Stewart, hitting Steward once in the shoulder blade as Stewart exited the car.  *Id.*  Mr. Lawrence then retrieved a firearm and fired toward the back of Wallie Howard's

head, killing him.  *Id*.  Stewart and Mr. Lawrence then attempted to flee the scene without taking the money.

Robert Lawrence, along with several co-defendants, were immediately arrested and charged in state court with various offenses stemming from the events of October 30, 1990.[1]  Mr. Lawrence was convicted following a trial and sentenced on May 1, 1991 to 25 years to life for two counts of murder in the second degree, five to 15 years on two counts of attempted robbery in the first degree, five to 15 years on two counts of criminal possession of a weapon in the second degree, all to run concurrently, as well as 5 to 15 years on one count of assault in the first degree, to run consecutive to the remaining counts, for a total sentence of 30 years to life imprisonment.  PSR ¶ 55.

On January 29, 1992, Mr. Lawrence was indicted on four counts charging him with Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 ("Count One"); First Degree Murder, in violation of 18 U.S.C. §§ 1111, 1114, 2 ("Count Six"); Murder of a Federal Law Enforcement Officer in Furtherance of a Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 2 ("Count Seven"); and Use of a Firearm in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(2) ("Count Eight").  He was convicted on all four charges following a jury trial on February 25, 1993, and was sentenced on May 28, 1993.  At the time, the Court was statutorily mandated to sentence him to life imprisonment without the possibility of parole for Counts One, Six, and Seven, with a mandatory five-year sentence on Count Eight to run consecutively.  He was sentenced accordingly.

---

[1]  Davidson was not charged in state court.

The United States Supreme Court has since established that statutorily mandated life imprisonment without the possibility of parole violates the Eighth Amendment's prohibition on cruel and unusual punishment for any defendant who commits the offense when under the age of eighteen.  *See Miller v. Alabama*, 132 S.Ct. 2455, 2464, 2474-75 (2012).  Now, for juveniles, a sentencing court must consider individualized mitigating factors in favor of a sentence that includes a meaningful opportunity for release. *Id.*

A motion to vacate Mr. Lawrence's sentence for Counts One, Six, and Seven was submitted on his behalf on February 22, 2013, and both parties agreed that Mr. Lawrence was entitled to resentencing pursuant to *Miller.*  On July 10, 2013, this Court granted Mr. Lawrence's motion to vacate and set aside the sentence and ordered a resentencing hearing pursuant to *Miller.*

The Probation Office has prepared an amended PSR in anticipation of resentencing.  In addition to summarizing the offense conduct and confirming much of Mr. Lawrence's background discussed below, the PSR establishes a guideline range of life based on a Total Offense Level of 43 and a Criminal History Category of I.  PSR ¶¶ 53, 56, 68.  Although Mr. Lawrence has no objection to the facts or technical guideline application contained in the PSR, as explained below, he respectfully requests this Court to grant a departure and statutory variance from the guideline range.

4

## ARGUMENT

## THIS COURT SHOULD IMPOSE A FEDERAL SENTENCE THAT ENSURES MR. LAWRENCE IS ELIGIBLE FOR RELEASE TO STATE PAROLE AND FEDERAL SUPERVISION AFTER SERVING A TOTAL SENTENCE OF 30 YEARS' IMPRISONMENT.

Notwithstanding the compelling mitigating factors present in Mr. Lawrence's case, the District Court at his initial sentencing recognized that it did not have the "authority for a downward departure." Sentencing Tr. at 6-7 ¶¶ 25-1 (May 28, 1993). The Court specifically noted that defense counsel's arguments at sentencing were futile because it was bound by the sentence proscribed in 18 U.S.C. § 1111. *Id.* at 7 ¶¶ 19-23. Accordingly, the Court imposed a sentence of life imprisonment without the possibility of parole because it was "within the guideline imprisonment range" and because the Court was statutorily required to do so. *Id.* at 9 ¶¶ 21-22.

Unlike Mr. Lawrence's original sentencing court, this Court *has* the discretion to – and indeed is required to – consider Mr. Lawrence's mitigating factors before imposing a sentence. A careful consideration of the totality of the relevant circumstances surrounding this case should lead this Court to exercise its sentencing discretion under *United States v. Booker*, 543 U.S. 220 (2005), and find that a combined federal sentence of six years to run concurrent to his 30 years to life state sentence is *sufficient but not greater than necessary* to meet the statutory purposes of punishment required by 18 U.S.C. § 3553(a). To accomplish that result, this Court can impose a one-year term on Counts 1, 6, and 7 to run concurrent with each other but consecutive to a five-year term on Count 8, all to run from the date of sentencing and to run concurrent to the state

sentence.  Furthermore, this Court should designate the state facility as the place of federal imprisonment.

Imposing such a sentence would not render Mr. Lawrence eligible for immediate release. This is because he is currently serving a sentence of thirty years to life on state convictions for the same underlying offense conduct.  As matters currently stand, should the State Parole Board decide Mr. Lawrence is rehabilitated and deserves to be released back into society, he would merely be released into federal custody and continue to be imprisoned for the rest of his life.  For the reasons set forth below, defense counsel asks this Court to ensure that after Mr. Lawrence has served a severe punishment of 30 years' imprisonment, he is provided an opportunity to demonstrate his rehabilitation to the state parole board and seek his release to parole and federal supervised release.  His state parole eligibility date is October 28, 2020.  Upholding Mr. Lawrence's sentence of life imprisonment without the possibility of parole would be cruel, unusual and significantly greater than necessary to meet the statutory purposes of punishment.

I.      **THE REQUESTED SENTENCE IS APPROPRIATE CONSIDERING MR. LAWRENCE'S BACKGROUND, AGE AT THE TIME OF THE OFFENSE, AND HIS DIMINISHED CAPACITY AS A JUVENILE.**

A careful review of Robert Lawrence's individualized mitigating factors, as required by both *Booker* and *Miller*, the nature and circumstances of the offense and history and characteristics of the defense as mandated by 18 U.S.C. § 3553(a)(1), the sentencing guidelines, and his diminished capacity as a juvenile should lead this court to conclude that life imprisonment without the possibility of parole violated, and continues to violate, his Eighth Amendment right against cruel and unusual punishment.  Taking each of these considerations

into account, this Court should impose a sentence that makes Mr. Lawrence eligible for release to state parole and federal supervision after serving a combined 30-year term of imprisonment.

> **A.   Robert Lawrences's background and the circumstances surrounding the offense warrant a sentence that renders him eligible for state parole.**

Robert Lawrence is remorseful and takes full responsibility for his participation in the instant offense.  Notwithstanding, he submits that a sentence of life imprisonment without the possibility of parole is unconstitutionally harsh based on the nature and circumstances of the offense.

At the tender age of fifteen, Robert was recruited by Jamie A. Davidson, who was in his early twenties, to leave his home in Brooklyn and move to Syracuse with the promise of making $800 per week.   *See* Indictment for Criminal Action No. 92-CR-35 at 1 (Jan. 29, 1992); Govt. Sentencing Mem., No. 92-CR-35 at 3, 6 (Mar. 23, 1993).  Davidson, the leader of a drug conspiracy, became Robert's surrogate father at the time he was recruiting persons "to bring cocaine from the New York City area for redistribution in the Syracuse area." PSR ¶ 2.  Robert was an easy target for Davidson because he lived in the same neighborhood and Davidson knew that Robert lacked parental guidance and support and was desperate to be accepted by the "older crowd."

From the day he was born, Robert Lawrence never experienced a stable, loving home environment.  He has been described as a "street baby" by his surrogate mother, Andrea Lyons.  Ms. Lyons stated in a phone interview that she helped provide Robert with some of his basic necessities from the time he was an infant through kindergarten.  At that time, Ms. Lyons herself was only 15 years old, but her mother was close friends with Robert's father and at her mother's

direction she would often try to take care of Robert.  Ms. Lyons vividly recalls that the first time she ever met Robert, he was only three days old and his mother brought him to the newsstand where Ms. Lyons was working as a cashier, handed him over to her and said, "I will be right back."  His mother did not return before his father showed up much later and Ms. Lyons stated, "Maureen said this is your baby."

Robert's father had little interest in providing for his infant son because he was too busy operating a pool hall fraught with gambling, fighting and adults using drugs.  According to Ms. Lyons, Robert was raised in the smoked filled pool hall from the time he was an infant until he began running the streets as a young boy.  By then, he had already been exposed to adult vices day in and day out and it was all he knew.  His mother ran the streets selling and smoking crack and his father was running numbers out of the pool hall.

Robert was passed on from person to person and in some cases, he has no recollection of the people who had legal guardianship over him at various times throughout his youth.  For example, one document discovered among his school records dated April 23, 1982, reflects that his mother, Maureen Julien, signed over guardianship to Carol Ackerson and Bright Massey, but Robert has no recollection of either person and has no idea who they were.  *See* notarized declaration, dated April 23, 1982 attached hereto. This was his mother's pattern when he was a child. She avoided responsibility for her son and gladly turned him over to anyone who would take him so she could continue to run the streets.

Robert had dreams and goals for his future, but he did not have an adult to help him pursue his passion.  When Robert was in seventh grade, he filled out an interest assessment in school and he indicated he wanted to be a football player when he graduated.  He stated his

8

favorite school subject was reading and the one positive character trait he identified about himself was that he was brave. *See* Interest Determination, Exploration and Assessment questionnaire, dated November 25, 1986 attached hereto. Sadly, he would never have the ability to pursue his dreams because less than four years later he became entangled in the Davidson drug conspiracy, which ultimately led to the tragic death of undercover Officer Howard.

It was his mother, a drug addict, who ultimately made the regretful decision to relinquish her parental responsibilities to a gang of drug dealers, whom she allowed to relocate her son to Syracuse, New York, some 300 miles from his home at the age of fifteen. *See* Admission Form for New Entrants School Records, date stamped January 8, 1990 attached hereto. At the time, Robert was swept up in the Davidson drug ring, he lacked the maturity to consent to the move, let alone to joining a conspiracy. He was merely entering his sophomore year in high school and the New York City Division of Special Education had classified him as learning disabled and recommended special education classes. *See* Board of Education of The City of New York Division of Special Education recommendation, dated March 10, 1988 attached hereto. When Robert was relocated to Syracuse, a city almost 300 miles away from home, by Davidson and the older co-conspirators, he was completely reliant on them when they immersed him in the drug community. Tragically, he was left at their mercy and he followed their orders. He never really attended high school once he moved to Syracuse. Although his records were transferred to Henninger High School and he enrolled there, he did not have transportation, or the support necessary to succeed in the classroom. The world he knew involved hustling on the street corners for Davidson and his crew, and not much more. When he was told to do something, he did it, if nothing more than for self-preservation.

9

On October 30, 1990, sixteen-year-old Robert received orders from Davidson to rob

undercover Agent Howard during the pre-arranged drug deal, and Davidson's "chief lieutenant,"

Lenworth Parke, handed him a gun.  When Robert and co-defendant Gary Anthony Stewart

attempted the robbery as directed, undercover Agent Howard shot Stewart.  Govt. Sentencing

Mem. at 16 (1993).  As defense counsel stated at Mr. Lawrence's sentencing hearing on May 28,

1993:

> Mr. Lawrence on his behalf at that point in time I think reacted and I would submit
> reacted automatically to what was happening.  He was standing there, he heard the
> gun shots, saw Mr. Stewart fall, believed he was dead.  And I do not believe that it
> was an act that had any thought process behind it, but it was rather an automatic
> response to what was happening, in self-defense, if you will.

Sentencing Tr. at 6, ¶¶ 9-15.

It is obvious that Mr. Lawrence was fearful for his own life, and impulsively fired his gun.  *See*

PSR ¶ 29; Govt. Sentencing Mem. at 16 (1993).

While the diminished capacity of juveniles as an age group is detailed more thoroughly

below, Robert had particular disadvantages that made him extremely vulnerable to Davidson's

influences and the impulsiveness of the offense.  A psychological assessment of Mr. Lawrence in

1988 showed that he was "immature with a tendency toward impulsiveness." PSR ¶ 64.  While

he functioned within the average range of school-related areas, he was not functioning at his

optimum level due to emotional factors.  *Id.* He was enrolled in special education classes and

group counseling as a result – however, he was unable to verbalize his feelings at the time and so

made little progress.  *Id.*  Robert was classified as learning disabled and recommended for

special classes and related services.  *See* Board of Education of the City of New York, Division

of Special Education document, dated March 10, 1988 attached hereto.  These particular

vulnerabilities were not able to be taken into account when he was initially sentenced due to the statutorily mandated penalty for his offense.

      **B.**    **The diminished capacity of Robert Lawrence and juvenile offenders more generally warrants a sentence making him eligible for state parole.**

The United States Supreme Court has established that "children are constitutionally different from adults for purposes of sentencing." *See Miller*, 132 S.Ct. at 1264.  As explained by the Court:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.

*Id.* at 2468.

The Court based its decision to ban mandatory life imprisonment without the possibility of parole on scientific evidence.  Specifically, scientific evidence reveals that juvenile defendants are less culpable than adult offenders because of their diminished capacity – which is "evident in the same way, and to the same degree" when "a botched robbery turns into a killing" as in a non-homicide case. *Id.* at 2465. "While science cannot gauge moral culpability, scientists can shed light on some of the measurable attributes that the law has long treated as highly relevant to culpability and the appropriateness of punishment."[2]

In their Amicus Brief, the American Medical Association and American Academy of Child and Adolescent Psychiatry noted that juveniles' diminished capacity is a function of

---

[2] Brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party in Miller v. Alabama at *3.

"psychosocial limitations in their ability to consistently and reliably control their behavior."[3]

Developmental research shows that cognitive and psychosocial development do not develop at

the same rate – i.e. an adolescent might have similar cognitive abilities as an adult yet

simultaneously have deficient psychosocial abilities.[4] Indeed, incidents of delinquency and crime

"'peak sharply'" in adolescence because of the psychosocial features of that age group.[5]

"Psychosocial features of adolescence, such as susceptibility to peer influence, a desire to save

face and maintain loyalty to friends, and impulsivity driven by fear and adrenaline, may prevent

[a] fifteen-year-old from engaging, in the heat of the moment, in a logical analysis of the long-

term consequences of his actions."[6] "In other words, adolescent behavioral research suggests that

adolescents take more risks because they overvalue the potential reward, not because they are

less able to appreciate the risks, as was once believed."[7]

"'[O]ne of the hallmarks of adolescent risk taking is that it is much more likely than that

of adults to occur in the presence of peers, as evidenced in studies of reckless driving, substance

abuse, and crime.'"[8] Peer pressure "can arouse emotions of fear, rejection, or desire to impress

friends that can undermine the reliability of adolescent behavioral control systems and result in

---

[3] *Id.* at *6 (citing Elizabeth Cauffman & Lawrence Steinberg, (*Im)Maturity of Judgment in Adolescences: Why Adolescents May Be Less Culpable Than Adults*, 18 BEHAV. SCI. & L. 741, 742 (2000)).

[4] Kristin Henning, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform*, 98 CORNELL L. REV. 383, 399 (2013) (citing Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 HOFSTRA L. REV. 547, 555-56 (2000); Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 5 ANN. REV. CLINICAL PSYCHOL. 459, 466-68 (2009)).

[5] Henning, *supra* note 8 at 400(citing Terrie E. Moffitt, *Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy*, 100 PSYCHOL. REV. 674, 675 (1993)).

[6] Henning, *supra* note 8 at 399-400 (citing Elizabeth S. Scott & Laurence Steinberg, *Rethinking Juvenile Justice* at 38-39 (2008); Dustin Albert & Laurence Steinberg, *Judgment and Decision Making in Adolescence*, 21 J. Res. on Adolescence 211, 219-20 (2011)).

[7] Amicus Brief, *supra* note 6 at *8 (citing Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 16:3 ANN. REV. CLINICAL PSYCHOL. 47, 58 (2009)).

[8] Amicus Brief, *supra* note 6 at *9 (citing Albert Chein, et al., *Peers Increase Adolescent Risk Taking by Enhancing Activity in the Brain's Reward Circuitry*, 14:2 DEVELOPMENTAL SCI. F1, F1 (2011)).

actions taken without full consideration or appreciation of the consequences."[9] In short, group delinquency and illicit behavior is more common in adolescence because adolescents fear rejection and desire approval from their peers more so than adults.[10]

Robert Lawrence is a classic example of a juvenile offender who suffered from these psychosocial features of adolescence. He was highly susceptible to peer-influence. There is no question that Robert was controlled by Jaime Davidson and his older co-conspirators. His actions relevant to the conspiracy stemmed from their control, influence, and Robert's desire to please his role models. It was not merely his young age but his own psychological and psychosocial issues which led him to the commission of the instant offense. Robert impulsively reacted to Mr. Stewart being shot by undercover Agent Howard. He fired his gun without fully considering or appreciating the consequences of that action. Indeed, Robert ran away in fear without even being sure that he had hit undercover Agent Howard and without taking the money. *See* PSR ¶ 29.

In light of the diminished capacity of juvenile defendants, the American Medical Association and American Academy of Child and Adolescent Psychiatry concluded that the Eighth Amendment "prohibits the imposition of a sentence of life without the possibility of parole on an adolescent offender."[11] In this case, Mr. Lawrence's diminished capacity, in conjunction with the nature and circumstances of his offense, warrants a sentence other than life.

---

[9] Amicus Brief, *supra* note 6 at *12 (citing Laurence Steinberg & Kathryn C. Monahan, *Age Differences in Resistance to Peer Influence*, 43 Developmental Psychol. 1531, 1536-38 (2007)).

[10] Henning, *supra* note 8 at 399 (citing Scott & Steinberg, *supra* note 10 at 38-39; Terrie E. Moffitt, *Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy*, 100 PSYCHOL. REV. 674, 686-88 (1993)).

[11] Amicus Brief, *supra* note 6 at *37.

**C.     A combined sentence of 30 years' imprisonment is consistent with the Sentencing Guidelines.**

A below-guideline range sentence is authorized by the Sentencing Commission.  In particular, three factors addressed by the Sentencing Commission warrant a below-guideline sentence in this case.[12]  *See* U.S.S.G. § 5K2.0; 18 U.S.C. § 3553(b).  First, pursuant to U.S.S.G. § 5H1.1, a sentencing court may consider a defendant's age in determining whether a departure is warranted, "if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines."  Second, pursuant to U.S.S.G. § 5H1.3, a court may sentence a defendant below the guidelines on the basis of his mental and emotional conduct, "if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  Finally, pursuant to U.S.S.G. § 5K2.13, a sentencing court may grant a downward departure for diminished capacity "if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."

As outlined above, consideration of all three of these guideline provisions warrant a sentence below the guideline range in this case.  Perhaps most obviously, Mr. Lawrence's age at the time of the offense distinguish this case from the typical case covered by the guidelines, which include planned multiple murders committed by adults with significant criminal histories.  In contrast, Mr. Lawrence committed the offenses when he was 16 years and did so without

---

[12]   Even if the factors identified by defense counsel do not technically merit a sentence below the guideline range according to the sentencing guidelines, the requested sentence is still authorized by *Booker*, *Miller*, and 18 U.S.C. § 3553(a).

planning and a prior criminal conviction. Furthermore, he was instructed to participate in the planned robbery by the leader of the drug organization, which recruited him to relocate from Brooklyn to Syracuse, several hundred miles away from his family. In addition to his age, Robert's learning disability, attention deficits, impulsiveness, and diminished capacity to appreciate the nature of his offenses all warrant a departure pursuant to U.S.S.G. § 5H1.3 and U.S.S.G. § 5K2.13. While any one of these factors warrants a departure, all three together support a departure that ensures Roberts is eligible for release to state parole and federal supervision after serving 30 years' imprisonment.

II.  **THE EFFORTS MR. LAWRENCE HAS MADE TOWARD REHABILITATION IN THE 22 YEARS HE HAS BEEN INCARCERATED EXEMPLIFY THE PROSPECT FOR REFORM ATTRIBUTED TO JUVENILE OFFENDERS THAT INFORMED THE SUPREME COURT'S HOLDING IN *MILLER V. ALABAMA,* AND SUPPORT IMPOSING THE REQUESTED SENTENCE .**

"[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) (quoting *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000)). The United States Supreme Court has specifically held that "a district court at resentencing may consider evidence of the defendant's post-sentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." *Pepper*, 131 S.Ct. at 1236; *see also United States v. Saikaly*, 207 F.3d 363, 370 (6th Cir. 2000) (finding "same concerns apply at resentencing whether it occurs following direct appeal or a § 2255 motion"). Evidence of "post-sentencing rehabilitation bears directly on the District Court's overarching

duty to 'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing." *Pepper*, 131 S.Ct. at 1243 (citing 18 U.S.C. § 3553(a)).

Mr. Lawrence has evidenced his ability to lead a law-abiding and productive life should he be given a reasonable opportunity for release. His post sentencing rehabilitative efforts are substantial. He has avoided any type of gang affiliation, violence[13], and drug activity during his incarceration in a maximum security prison. Instead, he has chosen to work through the prison system in a reputable fashion and has earned the privilege of residing on the honors block. During the day, he works in the radio room running the DVD system for the inmates; at night, he volunteers to clean up the recreational yard. Moreover, while in prison he has earned his GED, along with certificates in food service and legal research. *See* Certificate for High School Equivalency Diploma, dated August 1997; Food Service Training Certificate, dated April 1996; and Certificate of Merit for Basic Legal Research and Law Library Management, dated June 10, 2002 attached hereto. Mr. Lawrence has worked tirelessly throughout the years in various jobs throughout the different facilities he has been housed. In 1994, while at Elmira Correctional Facility, he worked in the kitchen earning 30 cents per hour and gradually earned pay increases of up to 42 cents per hour because of his work ethic and ability. He saved what little money he earned. He became a very good baker, which was noted on his performance evaluations. He eventually earned his certificate for legal research and law library management and he began working in the law library. Mr. Lawrence also excelled in his responsibilities as an employee within the law library. *See* Inmate Progress Report, dated March 25, 2002 attached hereto. He continued to save his earnings and sent his mother money from his inmate account because he

---

[13] Mr. Lawrence has minimal disciplinary infractions in the twenty-one years of his incarceration in a maximum security facility.

16

"wanted her to have it."  *See* Great Meadow Correctional Facility Approval Form For Disbursements attached hereto.  He willingly gave his mother every cent of his hard earned money because he wanted to help her, notwithstanding the fact she was seldom ever able to visit or maintain regular contact with him throughout the years.

Despite his incarceration, he has maintained a strong relationship with his girlfriend and last year they married.  *See* Certificate of Marriage April 27, 2012 attached hereto.  He has spent the last twenty-two years reflecting on his conduct and learning to move forward as a respectable adult male within the New York State Prison System.  *See* letter from Robert Lawrence attached hereto.  In his letter he states, "October 30, 1990 is a moment in time I so badly wish I could take back, I will bear the guilt of my actions on that day for the rest of my life.  Mr. Howard was a good man, I didn't know him personally but his occupation spoke volumes to his righteousness.  Soon after being held responsible for Mr. Howard's death and sent to prison, I started realizing the impact and how much damage I caused."  *Id.*

Robert Lawrence has evolved into a compassionate adult and he takes full responsibility for his conduct. He blames no one but himself for his actions and remarkably he harbors no resentment toward his family or co-conspirators.

### III. IMPOSING A SENTENCE THAT ENSURES MR. LAWRENCE'S ELIGIBILITY FOR RELEASE TO STATE PAROLE AND FEDERAL SUPERVISION AFTER SERVING A 30-YEAR TERM OF IMPRISONMENT IS CONSISTENT WITH THE STATUTORY PURPOSES OF SENTENCING.

When imposing a sentence, a court is required to consider the statutory purposes of sentencing, which include the following needs identified in 18 U.S.C. § 3553(a)(2):

17

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocation training, medical care, or other correctional treatment in the most effective manner.

Congress also instructed sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been fond guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6).

A sentence that requires Mr. Lawrence to serve 30 years in prison, but ensures his eligibility for release to state parole and federal supervision will satisfy each of these purposes of sentencing.  Robert Lawrence committed the underlying offenses when he was 16 years old.  He has never taken a breath of air as a free adult man.  If required to serve 30 years, he will have missed his late adolescence, and will spend all of his 20s, 30s, and half of his 40s in prison. Remarkably, he has served all of that time faced with the prospect of spending the rest of his life in prison.  If he were to be released to state parole and federal supervision after serving 30 years, he would be 46 years old.  In all likelihood, his opportunity for having and raising children will have passed.  Given his age, his risk of recidivism would have also been significantly reduced. Any risk of recidivism would also be minimized given that all of his co-defendants are still be imprisoned and any prior criminal connections severed.  In light of the circumstances of this case, a federal sentence that ensures Mr. Lawrence's eligibility for state parole and federal supervision after serving 30 years' imprisonment would adequately serve the purposes of

18

retribution, deterrence, and incapacitation.  What is more, as detailed above, Mr. Lawrence has made the most of his imprisonment by seeking educational and vocational training.

In addition to serving the purposes of sentencing, the requested sentence will also avoid unwarranted disparities.  As stated in *Miller*, "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 132 S.Ct. at 2469.  Indeed, since *Miller*, defense counsel is aware of only one case where the Court found life imprisonment without the possibility of parole to be a constitutional punishment for a juvenile defendant. *See United States v. Maldonado*, 2012 WL 5878673 (S.D.N.Y. 2012).  The *Maldonado* Court reasoned that the extreme nature of the conduct underlying the defendant's offense rendered such a punishment appropriate.  *Id.* at *10.

In *Maldonado*, the defendant was found guilty of two counts of intentional murder while engaged in a drug trafficking crime, in violation of 21 U.S.C. § 848(e)(1)(A), two counts of death through the use of a firearm, in violation of 18 U.S.C. § 924(j), and two counts of use of an interstate commerce facility in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958. *Id.* at *1.  The *Maldonado* Court held that the defendant's age (four months shy of his eighteenth birthday) was offset by the aggravating factors presented in his case.  Specifically, the defendant was a "killer-for-hire." *Id.* at *10.  His crimes were "premeditated, cold-blooded, and committed for profit," and he had previously been convicted of murder and attempted murder he committed after he had reached the age of majority.  *Id.*  Moreover, the Court placed great emphasis on the defendant's failure to demonstrate "the capacity or will to rehabilitate himself" while incarcerated. *Maldonado*, 2012 WL 5878673 at *10.

19

The aggravating factors that informed the Court's decision in *Maldonado* simply are not present in Mr. Lawrence's case.  Unlike in *Maldonado*, Mr. Lawrence's offense was not planned; there was no evidence to suggest that he intended to kill anyone during the commission of the robbery.  *See* PSR ¶ 2.  Neither did Mr. Lawrence kill undercover Agent Howard in cold-blood, but rather it was arguably done in self-defense and in the heat of the moment as a reaction to shots fired at his co-defendant.  Additionally, unlike in *Maldonado*, Mr. Lawrence was younger, had no prior criminal convictions and has demonstrated both the capacity and the will to rehabilitate himself.  Consequently, Mr. Lawrence should be given a reasonable opportunity for release.

## CONCLUSION

There is no question that Robert Lawrence's desire to be accepted by Jaime Davidson and the older members of the conspiracy led to some very poor decisions on his part.  Regrettably, these poor decisions led to the tragic death of Agent Howard.  The nature and circumstances of the offense, however, do not warrant a sentence of life imprisonment without the possibility of parole.  Indeed, such a sentence is significantly greater than necessary to meet the statutory purposes of punishment.  Such a sentence is cruel and unusual in light of Mr. Lawrence's age and related diminished capacity at the time of the offense.  Accordingly, defense counsel submits that a sentence of six years to run concurrent with his state sentence is *sufficient but not greater than necessary* to meet the statutory purposes of punishment.  In particular, defense counsel requests this Court to impose a one-year sentence on Counts 1, 6, and 7, to run concurrent to each other but consecutive to a five-year sentence on Count 8.  To ensure that Mr. Lawrence will be eligible for release to state parole and federal supervision after serving a

combined 30-year sentence, defense counsel requests this Court to designate the state facility as

the place of federal incarceration.  This type of sentence would allow Mr. Lawrence a reasonable

opportunity for release by the New York State Parole Board, which is well-suited to determine

whether and when Mr. Lawrence should be reintegrated back into society.


DATED:        December 19, 2013          OFFICE OF THE FEDERAL PUBLIC DEFENDER


                                         LISA A. PEEBLES
                                         Bar Roll No. 507041
                                         Clinton Exchange, 3rd Floor
                                         4 Clinton Street
                                         Syracuse, New York   13202
                                         (315) 701-0080

To:     John Duncan, AUSA
        Ben Berry, USPO
        Robert Lawrence