Case 5:92-cr-00035-DNH   Document 310-2   Filed 12/20/13   Page 1 of 7

# EXHIBIT B

## Affidavit of Robert Lawrence

Personally appear before me, the undersigned officer duly authorized by law to administer oath, ROBERT LAWRENCE, being duly sworn, and states that he has personal knowledge of the following facts and they are true and correct.

1. My name is Robert Lawrence. I am over the age of 18 years old and under no disability that would make me incompetent to testify;

2. I have personal knowledge of the facts set forth in this affidavit.

3. On October 30th, 1990 Juan "Pedro" Morales came to my then girlfriend's apartment at 317 Elm St. Syracuse, New York and asked me to help him go take care of a deal for Jaime A. Davidson, because this guy had robbed Jaime;

4. That same morning of October 30th, 1990, Pedro took me into a room, handed me over a .357 revolver and said to hold it just in case the guy tried to rob them again; And this alleged guy happened to be Luther "Dooley" Gregory;

5. The way Pedro kept using Jaime's name so loosely between orders and commands stating that Jaime said to do this or that, made me truly believe that Jaime was in on the deal and he was working through Morales in sending his orders;

6. When Morales came to my ex-girlfriend's apartment and I looked out the window and saw Jaime's gray station wagon parked outside, I ask where was Jaime and Morales said, "Oh, he's around here.";

7. It wasn't until much later that I found out that Jaime really was not even in Syracuse on that day (October 30th, 1990) but Morales was talking like he was right around the corner or something;

8. I did not think nothing of seeing Morales driving Jaime's car, because I was once one of Jaime's artist's myself (for his sound system Baby Quake Hi-Power), I knew that Morales was one of Jaime's truck/van driver's—just like in New York City, the majority of times I would see Jaime's car and somebody different would be driving;

1

15. I had tried to have Mr. McGinty come and see me before the federal trial, to hire another expert to reconstruct the entire crime scene and conduct all the medical forensic medical test on Howard, Jr. including the alleged match of the bullet (found in Howard, Jr.'s head and the alleged .357 bullet from the gray Ford Station Wagon), but Mr. McGinty never, ever, came to see before the federal trial, he just showed up the day of the trial while all along declining to talk with me stating that all the trial attorneys had already agreed that it would be a waste of time and money getting a second expert opinion, because their expert had already concluded that I was the alleged trigger man that allegedly shot officer Howard, Jr.;

16. Had Mr. McGinty hired his own expert crime scene reconstructionist, forensic pathologist, ballistics expert and their conclusions could have been just a bit different, pointing that the alleged bullet traveled from far range and entered from the left side, I would have never taken the stand to claim self defense;

17. Had I known that Morales did not appeal his state murder trial and his records were sealed, that would have prompted me to believe something was definitely wrong and I would not have testified on self-defense, for lack of trust;

18. I had already been a bit suspicious of something being funny, because after we all had left Ms. Morrows apartment that October 30, 1990 afternoon and Morales dropped both Poppy (Gary Stewart) and me off at our other girlfriends houses saying that he had to take care of something first, and the first thing he said once returning was, "Jaime said to tie up Dooley in order to keep him away from the deal;" Once Morales had told me that Jaime was in New York, it had been on my mind as to who then Morales was dealing with that has been giving him orders;

19. Thinking about it good, every time I have tried to find out from Morales who he had went to see once he had dropped us off, that told him to tie up Dooley, he would always laugh and find a way not to answer my question and just took me away from that question, not to have to answer me;

20. If I had known that Poppy had a third affidavit and also had given a proffer statement to the Federal Prosecutor, Mr. John G. Duncan, that definitely would have

scared me from taking the stand, because I would not have known what Poppy had told Mr. Duncan, that would have been used against me to hurt my trial testimony;

21. I had sought legal advice from Mr. McGinty about the fact of taking the stand and if my prior criminal records would be used against me and he had assured me that it would not come up and that was the first thing I was caught by surprise with;

22. I had asked my trial attorney, Mr. James P. McGinty of what kind of trial defense I could raise that would exonerate my co-defendants from the alleged murder counts and Mr. McGinty stated that they (all trial counsels had already investigated that legal option and they all had concluded that self-defense would do) that is when I took my attorney's advise to claim self-defense as I wanted to take the stand;

23. Mr. McGinty had legally advised me that once I was to take the stand and claim self-defense, the judge would then instruct the jury to disregard all the murder counts against me and my codefendants because I was the only "one person" could legally claim self-defense; But, that was not the case after I had got off the stand;

24. When I had heard Ms. Kate Rosenthal ask the Hon. Judge for this so called Pinkerton Instruction to apply to all my co-defendants on the murder counts, I realized that Mr. McGinty had set me up by illegally advising me that both murder counts would be dropped against all my co-defendants and he didn't even try to object against it;

25. When I had explained to Mr. McGinty that I was standing right next to Howard, Jr.'s car window trying to look at his face to get his attention to have him open up the car door, Mr. McGinty advised me not to say that, because I would definitely be admitting that I alleged shot officer Howard, Jr.;

26. Mr. McGinty told me not to worry because he would lead me through my trial testimony and to say yes to his questions; And, Mr. McGinty said that the only way we could raise some type of doubt in the jury's mind, was to say that I was just turning the corner of Howard, Jr.'s car trunk when I seen his hand coming towards me, and I had backed up and squeezed the trigger and saw a little whole in the back right window;

27. Mr. McGinty had told me to pay close attention to all the prosecutors witnesses' trial testimony and especially to Jaime's alibi witnesses' trial testimony because I would have to discredit their testimonies by placing Jaime at Ms. Morrows apartment that Oct. 30th, 1990 morning of the alleged meeting in Syracuse, NY, to convince the jury by saying Jaime allegedly gave me the .357 revolver and told everybody what to do, just in order to exonerate all my co-defendants and help them;

28. To show exactly how Mr. McGinty was leading me and that I testified by following his instructions was when Mr. McGinty had asked me if I was "scouting" the area at Mario's Big M Parking Lot and I had testified yes; But when the prosecutor had asked me if I was "scouting" that same area, I immediately jumped up and said no;

29. I had told Mr. McGinty when I was standing right next to Howard, Jr.'s car window and I heard the bangs, I had closed my eyes a little and when I opened up my eyes I immediately saw a big swollen lump on the right side of Howard's face;

30. Mr. McGinty advised me not to testify to the closing of my eyes and seeing Howard, Jr.'s face swollen because as Mr. Stewart Bennett concluded and confirmed that the alleged shooter was positioned right where I was allegedly standing and we only want the jury to get a slight doubt that I might not have been the alleged trigger man;

31. Prior to me taking the stand, all of us (Morales, Stewart, Parke and myself) had gotten together and held a meeting set up by Morales to decided who would testify against Jaime without Jaime knowing about it, but our attorneys knew, including Mr. McGinty, that we would get our stories straight and that is where Morales kept stressing to me that my testimony could not be different from what was already said in his two(2) statements and Poppy's two (2) affidavits, because Morales attorney told him that that would tend to make the jury think that I am lying; I ended up asking Mr. McGinty for legal advise as to that and he also advised me to keep my testimony in line with both Morales and Stewart's affidavit statements so that my trail testimony could have weight and credibility;

32. At that meeting, Morales told me to keep my eyes on him if I couldn't answer a question and if he gave me that

look and slight tilt of the head, to just tell the jury that, "In my 2½ years in prison for Jaime, he (Jaime Davidson) didn't even try to look out for me and my family;"

33. Jaime did not know what my trail testimony on self defense was going to happen because Morales was telling us that Jaime's Lawyer was not down with the other attorneys entire trial strategy; so after I asked my attorney for some legal advise as to that, Mr. McGinty only said that Jaime's lawyer wasn't all that in accord with the pointing of the fingers, therefore, my trial testimony would have to catch them both (Jaime and his lawyer) off guard and by surprise and I just had to be ready to stick to my story;

34. Mr. McGinty said that once I mentioned Jaime's name it would have been too late for Jaime's lawyers to change their trail tactics, but it would give strength and a lot of credibility to my self-defense testimony;

35. At one point while Jaime's lawyer was cross-examining me on the stand, I was really confused because he (Mr. John Laidlaw) looked very mad, especially when one the other attorneys began objecting to his line of cross-examinations, so I thought that they were protecting me from Jaime's lawyer and once I looked at Morales from the stand, Morales shook his head at me to do as we had planned; put all the blame on Jaime, because as Mr. McGinty had advised me, that Jaime's name wasn't really being called and it was possible that the jury would not find Jaime guilt anyway, and the most serious counts (VI and VII) would be dropped against Jaime too;

36. Once I was on the stand realizing that Mr. McGinty had lied to me and set me up and Mr. Laidlaw (Jaime's lawyer) kept destroying my credibility I remembered the statement Juan "Pedro" Morales keep stressing to me over and over, "Man, Bam, look at this shit, after we did everything Jaime asked us to do, the motherf_ck_r is out their living the life without sending us a dollar, nor giving our family anything;"

37. When the prosecutor was asking me if I had knocked on Howard, Jr.'s window (glass) front right passenger side while Stewart was in the car with him, I denied it, but I was shocked to hear him ask me about that, because only Stewart knew that and I wanted to know who told him that

because the trial testimony was that I was trying to open up the door saying foul language;

38. Once the trial had ended with everybody being found guilty on all counts charged, I immediately realized that Mr. McGinty had told me wrong and with Morales also lying to me, to actually testify falsely against Jaime; I then made a number of drastic attempts to have Mr. McGinty come and visit me so I could correct the damage done but he would not answer me back;

39. I had to end up writing the Honorable Judge Neal P. McCurn, then Mr. McGinty wrote me back lying to me that he had wrote me because I called to clarify the record on my direct appeal but Mr. McGinty submitted it without consulting me trying to hide from wrongly advising me and knowingly lying to me;

40. Mr. McGinty knowing that he was the main person to be blamed for knowingly misleading me, he never wanted the truth to come out that is why Mr. McGinty made sure to cut off all means of communications with me;

41. All my letters attached to this Affidavit along with letters from Mr. McGinty will support the fact that I attempted to correct the trail record but he declined to talk to me.

**FURTHER AFFIANT SAITH NOT.**

       This _____ day of _____, 2000.

Sworn to and subscribed this

_25_ day of _July_, 2000          _Robert Lawrence_
                                   Robert Lawrence

_[signature]_
Notary Public
Commission Harry DeBurgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires 6-7-2002